LAW OFFICES

**GIBSON, NAKAMURA & GREEN, P.L.L.C.**

2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

Scott D. Gibson, SBN 007395
Kristen M. Green, SBN 019802
ecf@gnglaw.com
Attorneys for Debtor

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>DEED AND NOTE TRADERS, L.L.C.<br><br>                            Debtor. | In Proceedings Under<br>Chapter 11<br><br>NO. 4-10-bk- 03640 -EWH<br><br>**DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION DATED APRIL 2, 2010** |

## I.       <u>PURPOSE OF DISCLOSURE STATEMENT.</u>

The Debtor and Debtor-in-Possession, Deed and Note Traders, L.L.C.. (the "Debtor" or "DNT") is providing this Disclosure Statement (the "Disclosure Statement") to all of its known creditors and to its equity security holder pursuant to 11 U.S.C. § 1125 in order to permit them to make an informed judgment in exercising the right to vote on the Debtor's Plan of Reorganization dated April 2, 2010 (the "Plan") described below.  A copy of the Plan is attached hereto as Exhibit "1".  This Disclosure Statement is being furnished to all known creditors and equity security holders of the Debtor to inform them about the Plan and their rights with respect thereto.

GIBSON, NAKAMURA & GREEN, P.L.L.C.
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

## II. SOURCE OF INFORMATION.

The information contained herein has been compiled from records of the Debtor.

## III. STRUCTURE OF THE DEBTOR.

DNT Homes is an Arizona limited liability company created and formerly owned 100% by David Kinas and his family members ("Kinas"). In 2006, ownership of the Debtor was transferred to The Kinas Family Trust. The Debtor was created in 1993 and since that time has been engaged the real estate business in Tucson, Arizona, primarily purchasing, leasing and selling residential properties. David Kinas, is the Manager of the Debtor and responsible for the day-to-day activities of the Debtor's business operations.

## IV. HISTORY OF THE DEBTOR.

### A. PREPETITION EVENTS.

Over the years, DNT has purchased, owned, rehabilitated, leased and sold hundreds of residential properties in Tucson and surrounding areas. Many, but not all of the properties were acquired by property owners in financial distress or purchased in actual foreclosures, although a fair number of properties were acquired through normal market transactions, including the purchase of a number of newly constructed production homes.

While DNT experienced the many ups and downs of the real estate market over the years, until mid-2007 it generally operated profitably with revenues drawn primarily from rental income and sales proceeds. Funding of property purchases came from a number of sources. In addition to its own operating income, DNT obtained many loans from private investors, which loans would be secured by deed of trust liens on individual properties or groups of properties. Generally these loans were short-term high interest loans that allow DNT flexibility in acquiring properties on short notice. In most cases, after holding the property for a year or more, and after rehabbing the property, DNT would refinance the property with traditional lenders at market rates and hold the

property for investment as a rental property. As its portfolio grew, and property values increased, DNT began engaging in more sales of its inventory.

DNT was always looking at ways to expand its presence in the real estate market, and offered many programs for buyers to acquire and/or remain in their homes despite poor credit records or while facing foreclosures. Such programs included rent-to-own contracts, whereby would-be buyers that could not qualify for traditional financing, would rent the property for a year or more, thereby enhancing their credit scores and enabling them to obtain financing. In many cases, DNT would carry the financing for the Homebuyer. In other programs, DNT would agree to take title to homes in foreclosure and rent the homes back to the occupants with an option to repurchase the homes in the future. While DNT believe these programs provided a needed and valuable service to consumers, because the homeowners were often experiencing extreme financial distress, these programs came under scrutiny by the Arizona Attorney General. After lengthy negotiations, in December 2006, DNT entered into a Consent decree wherein it agreed, *inter alia,* to sell a number of homes back to their original owners. In addition, DNT agreed to pay a large sum as and for attorney's fees incurred by the State. These payments and transactions came on the heels of a declining real estate market and practically eliminate any operating reserves previously held by DNT. Sales of properties dropped radically and essentially stopped in August, 2007, with the announcement of the shut down and bankruptcy filing of First Magnus Financial Corporation, a large provider of traditional and non-traditional residential loan programs. When faced with the virtual elimination of funding sources for the buyers who typically purchase DNT inventory, and the corresponding loss of sales revenue, DNT realized that it could not longer support its operations on rental income alone and was forced into reorganization case under Title 11 in order to restructure its debt and reduce its cash flow requirements (the "First Chapter 11"). DNT successfully reorganized in the First Chapter 11 case and an Order Confirming the Debtor's Second Amended Plan Dated December 7, 2007 was entered by the Bankruptcy Court on October 23, 2008 (the "First Plan").

GIBSON, NAKAMURA & GREEN, P.L.L.C.
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

Under the First Plan, the payment terms of the secured claims of DNT's numerous creditors were modified to provide for interest only payments at a fixed annual rate of 5.6% (and somewhat higher for certain mortgages with less than a 20% equity cushion) over a period of seven years. The Plan in the First Chapter 11 case did not "cram down" the claims of any secured creditors in the traditional sense, in that the unpaid amounts of the claims of all secured creditors remained unchanged under the Plan. While the restructuring of the payment terms of the secured claims allowed DNT to remain current on its payments obligations to its secured creditors for a period of time post-confirmation, a continual decline in residential real property values in Tucson, Arizona, over the months following confirmation of the First Plan resulted in steadily declining rental rates for such properties. This in turn gradually resulted in the inability of DNT to continue to meet the debt service requirements under the First Plan. This case was filed for the sole purpose of valuing the Debtor's real estate assets under current market conditions and establishing the amount of the secured creditors claims under Bankruptcy Code §506 in light of such valuations. It is the intention of DNT to retain the payment terms established in the First Chapter 11 case and reduce the amount of the required payments based upon the amount of the secured claims following this valuation process. In addition, it is the intention of the Debtor to return certain non-performing properties to the secured lenders having liens in such properties where retention of such properties by DNT cannot occur without depleting the Debtor's operating reserves and sources of income and thereby subjecting its other properties to risk of loss.

## B.     <u>SUMMARY OF CURRENT OPERATIONS.</u>

Upon the filing of the Debtor's Petition, DNT filed a number of Motions designed to preserve the status quo of its operations and to preserve and protect its properties pending the formulation of its plan of reorganizations. These Motions included a request to allow DNT to use its rental and other sources of income to fund normal operations, a motion authorizing payment of all insurance and tax impounds on its properties, a motion authorizing payment of "wrapped mortgages"

GIBSON, NAKAMURA & GREEN, P.L.L.C.
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

or underlying debts on properties on which DNT held junior mortgages, and a motion authorizing sales and lease in the ordinary course of business. After notice and a hearing, these Motions were all granted (with certain limitations) by the Court and the Debtor has been operating its business as a Debtor-in-Possession since the filing.

Prior to the filing of its current Chapter 11 case, and to assist it in preserving its cash position, DNT ceased making all mortgage payments other than those for which it has sought court authorization to pay on an ongoing basis. It is DNT's intent to hold these funds in order to create an operating reserve to insure its successful emergence from Chapter 11. The filing of the First Chapter 11 case and the publicity over the Attorney General investigation and litigation has had an adverse effect on DNT's reputation and ability to effectively compete in the local rental property market. Accordingly, post confirmation, DNT has been utilizing a related entity, 881HOME, LLC, to conduct its rental operations. 881Home, LLC has no assets and merely acts as a rental agent for DNT. 881HOME collects rents on numerous properties owned by DNT, pays its direct out of pocket expenses associated with the rental activity (advertising etc.), and remits the balance of the rents to DNT. No fees are paid to 881Home, LLC by DNT.

Post-petition, the Debtor's operations have been similar in all respects to pre-petition activity. The employees of the Debtor, their salaries and job descriptions are attached as Exhibit "2" hereto ("Debtor's Employees").

## V. STATEMENT OF ASSETS AND LIABILITIES.

Other than its cash reserves, office equipment, furniture, supplies and a few vehicles, the Debtor's assets consist primarily of its inventory of residential properties and notes receivable. Specifically as reflected in its Schedules of Assets, as of the filing date the Debtor owned 159 properties, and held notes with a face value of approximately $2,439,000. The estimated value of its real estate holdings is $19,800,000, against which there are mortgages in the current amount of approximately $27,000,000.

DEED AND NOTE TRADERS\DISCLOSURE
STATEMENT- DNT 021710
04/6/10 2:43 PM

5

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

DNT has numerous secured lenders, both institutional and private. DNT's vehicles and equipment are all also subject to secured claims all as set forth in the Debtor's verified Schedules on file with the Bankruptcy Court. In addition to its secured debt, DNT has approximately $591,000 in general unsecured debt.

## VI.     DESCRIPTION OF THE PLAN.

The following is a brief summary of the more significant provisions of the Plan. This summary is qualified in its entirety by the full text of the Plan, which all creditors and equity security holders are urged to read carefully. The Plan, if confirmed, will be binding upon the Debtor, its creditors and the equity security holder. The capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them by the Plan.

### A.     CLASSIFICATION AND TREATMENT OF CLAIMS.

The Plan divides all claims into eight separate classes as follows:

**Class 1**. Class 1 consists of all Administrative Claims. These Claims, as and when each is an Allowed Claim, will be paid in full and in cash on the Effective Date, unless arrangements for later payments are made with the creditor or ordered by the Court. Class 1 Claims are unimpaired under the Plan.

**Class 2**. Class 2 consists of all Claims that are entitled to priority under Bankruptcy Code § 507(a)(3) through (10), to whatever extent (if any) that such Claims exist. Every Class 2 shall be paid in full, and in cash, in quarterly installments as and when funds are available in the Debtor's Non-Collateral Account, but in any event, not later than a date which is three years following the Effective Date of the Plan. Class 2 claims are impaired under the Plan.

**Class 3**. Class 3 consists of all Allowed Secured Claims which are those claims secured by liens on vehicles or equipment owned by the Debtor. The holders of the Class 3 Claims shall retain their liens and security interests in and to the assets of the Debtor. All terms and conditions of the confirmed plan in the First Chapter11 Case (the "First Plan") relating to the claims

**GIBSON, NAKAMURA & GREEN, P.L.L.C.**
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

of the Class 3 creditors will remain unchanged, except that any payments in arrears as of the Effective Date of the Plan shall be added to the end of the payment term of the First Plan and paid until the claim is paid in full, with interest as provided in the First Plan

> **Class 4**.  Class 4 consists of all real estate secured claims not otherwise classified under the Plan.  The Class 4 Claimants shall retain their lien and security interest in and to the real property securing said Claim, and all other terms and conditions regarding payment of the Class 4 Claims as set forth in the First Plan will remain unchanged except as modified by this Plan.  The Allowed Amount of the Class 4 Allowed Secured Claim shall be paid deferred cash payments aggregating the Outstanding Principal (defined in the Plan as the Fair market Value of the collateral securing each Class 4 Claims as of the Effective Date), together with interest accrued thereon from and after the Effective Date calculated at the rate of set forth in the First Plan.  Commencing on the 1st day of the second calendar month following the Effective Date and on the 1st day of each month thereafter for the remaining portion of the seven (or in some cases five) year term of the First Plan, interest shall be payable in arrears to the holders of the class 4 Claims.  The Outstanding Principal Balance and all accrued and unpaid interest thereon as provided herein shall be due and payable as of the Maturity Date set forth in the First Plan.

> The Class 4 Claims shall be pre-payable in whole or in part, without premium or penalty, at any time.  The holders of Class 4 Claims shall not be entitled to any attorneys' fees or expenses incurred in connection with this Reorganization.  The Class 4 Claims are impaired under the Plan.

> **Class 5.**  Class 5 consists of the secured claims of those claimants list in Exhibit "A" attached to the Plan.  The real property securing the claims of the Class 5 Claimants shall be surrendered to the Claimants upon the Effective Date of the Plan by way of a deed in lieu of foreclosure.  All rents from the real property securing the Class 5 Claimants shall remain with the Debtor to cover the costs associated with the Property while in the Possession of the Debtor.  Any

Class 5 Claimant wishing to take title to the Class 5 Property prior to the Effective Date shall make a request therefore to the Debtor and shall receive a Deed to the collateral; provided however, in exchange for such early surrender, any such Class 5 Claimant must agree to release any claim it may have for a deficiency against the Debtor. Class 5 Claimants that wait until the Effective to receive the title to the collateral shall have the right to a assert an unsecured claim for any deficiency, to the extent such right exists, provided a Proof of Claim supported by an appraisal prepared by a licensed appraiser is filed no later than thirty (30) following the Effective date. The Debtor shall thereafter have thirty (30) days to object to such claim; otherwise it shall be deemed allowed and paid as a Class 6 Claim. In the event the Debtor holds a rental or earnest money deposit from the current occupant of the premises to be surrendered, such deposit shall be surrendered: (i) to the holder of the Class 5 claim receiving the title to the Property, to the extend such holder assumes the rental or purchase agreement applicable to such property, with such deposit to be turned over at the termination of the tenancy and or the closing of the sale of such property; or (ii) to the occupant of the premises, to the extent the lease or option for the property is rejected by the Debtor. The refund of any Deposit shall not include any amount that was to be credited to a down payment as "rent credits". The Debtor reserves the right to add to or subtract from the properties included in Class 5 at any time prior to confirmation. If excluded from Class 5, the claim will be paid as a Class 4 Claim. The Class 5 Claims are impaired under the Plan.

Included in the Class 5 Claims shall be those secured creditors who were classified as Class 5 Creditors in the First Plan, who failed to record the Deeds tendered to them under the Order confirming the First Plan, except that such creditors shall have no right to a deficiency claim under this Plan ( such claim having been effectively waived under applicable Arizona law). In the event any Class 5 Creditor shall fail to record a Deed tendered pursuant to this Plan within thirty (30) days following the, the Debtor shall be authorized to record such Deed without the consent of the holder of the Class 5 Claim, and such recordation shall be binding upon any such Class 5 Claimant.

LAW OFFICES

**GIBSON, NAKAMURA & GREEN, P.L.L.C.**

2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

**Class 6**. Class 6 consists of the general unsecured Claims. The Class 6 claims shall be paid in full, in cash, in semi-annual installments in a pro rata amount from the Plan Fund, together with interest thereon at the federal judgment rate in effect from time to time. Class 6 Claims shall not include any interest charges, fees, or other costs incurred or assessed after the Petition Date through and including the Effective Date. The Class 6 Claims are impaired pursuant to this Plan.

**Class 7**. Class 7 consists of the equity ownership interest of the shareholder of the Debtor. The existing shareholder of the Debtor shall not receive any distribution on account of his interest unless and until all sums due in Classes 1 2 and 6 are paid in full pursuant to the Plan. The Class 7 Interest is impaired under the Plan.

**B.** **PROVISIONS FOR EXECUTION OF THE PLAN.**

The Plan proposes that, upon confirmation, ownership of the assets of the Chapter 11 estate be vested in the Debtor and the Debtor shall continue to lease, sell and purchase homes in the manner it had done, and under the direction of the individuals in control of the Debtor during the administration of the case. The Plan authorizes the Debtor to pay ordinary and necessary operating expenses in order to maintain a viable operation, including a reasonable salary to the officers and employees of the corporation, to the extent funds are available. The Debtor projects that future management of the Debtor will consist of the same individuals, performing the same tasks for the same compensation as existed prior to conformation. This will continue, at least until the unsecured claims in Class 6 have been paid in full.

Because it is unknown what value may ultimately be established for each property, it is impossible for the Debtor to provide any meaningful projections as to its income and expenses following the completion of the valuation process. However, the Debtor believes, that based upon the values set forth in Schedule "C" of the Verified Schedules of Assets on file with the Bankruptcy Court, it will be able to fund the Plan from rental income, without any requirement that it rely upon

GIBSON, NAKAMURA & GREEN, P.L.L.C.

LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

income from sale of properties, although the Debtor intend to remain active in the sale of its properties when and where it is prudent for such activity.

On the Effective Date, the Reorganized Debtor shall establish a Plan Fund consisting of a separate, segregated interest-bearing deposit account, into which the Debtor shall deposit funds for distribution to Class 6 claimants as required by the Plan. The Plan Fund shall be funded initially from all cash funds in the Debtor's possession on the Effective Date, less funds required to be paid under the Plan on the Effective Date and less funds required to establish the Operating Reserve Requirement. On or before the last Business Day of each full calendar month following the Effective Date, the Debtor shall deposit into the Plan Fund the Excess Net Cash Flow (Class Flow less expenses and mortgage payments and less amount to maintain or replenish the Operating Reserve to the Operating Reserve Requirement as Established in the Plan) received during the prior calendar month. All funds in the Plan Fund will be disbursed semi-annually, on a pro rata basis, to the holders of Class 6 Claims until such claims are paid in full with interest. Although it is difficult to predict when the Class 6 Claims will be paid in full, because sales revenues will be used to fund the Plan Fund, the Debtor expects that the Class 3 Claims could be paid in full in as little as 2-3 years.

## C.   MEANS FOR IMPLEMENTING PLAN

Feasibility of the Plan is based upon a significant reduction in the value of the Debtor's real estate assets and then in dependant solely upon rental income, rather than sales of assets. The operating expenses of the Debtor are not expect to increase above those the Debtor is current incurring as set forth in its monthly operating reports on file with the Bankruptcy Court. In addition to rentals, the Debtor will also continue to offer properties on a "Rent to Own" basis ("RTO"). Generally, these transactions involve leases from 18-24 months with a fixed purchase price at the conclusion of the lease. Although the Debtor would prefer that sales of the RTO properties be financed through outside sources, the Plan has been devised to allow the Debtor to

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

"carry" sales of RTO properties by utilizing "wrap around" financing. Under the provisions for treatment of the Class 4 Claimants under the Plan in the first Chapter 11 Case, the Debtor has included a clause eliminating the "due on sale" clause contained in most real estate financing documents. By eliminating these clauses, the Debtor can sell the RTO properties, leaving the existing liens in place and receiving a second or wrap around mortgage for the difference between the existing mortgage balance and the sales price. This in turn, increases the Debtor cash flow and enables the Debtor to accelerate payment to the Class 6 unsecured creditors. Moreover, the wraparound financing allows for sales to be consummated even if the current financial markets remain unavailable to the sub-prime borrower. This gives the Debtor an edge over other properties for sale where the Seller may not be in a position to offer to provide financing for the sale.

## VII.      CASH REQUIREMENTS AND ADMINISTRATIVE CLAIMS.

Counsel for the Debtor estimates that legal, accounting and other professional fees and costs, in excess of any retainers, to bring this matter to confirmation will aggregate approximately $40,000, and will make proper application to the Bankruptcy Court for approval of those fees. If approved, the Debtor anticipates that these fees and costs would be paid from funds in the Debtor's Unencumbered Account. Provision for payment of pre- and post-petition fees and for filing of post-confirmation reports with the United States Trustee are set forth in Sections 1.1 and Article 15 of the Plan.

## VIII.      LIQUIDATION ANALYSIS.

Under the Plan, all allowed claims are to be paid in full. Were the Debtor to cease operations, the Debtor's secured lenders, which hold a lien on virtually all of the Debtor's assets, would in all likelihood, foreclose on their collateral. Were this to occur, given current market conditions, it is unlikely the Debtor could sell the Properties to realize any equity before the foreclosures would occur. In such an event, the Debtor estimates that the value of any remaining assets would not be sufficient to pay the claims of unsecured creditors. The real estate and financing

markets in Tucson, Arizona, are presently in such a state of uncertainty that any attempt to further analyze the outcome of a liquidation and it benefits to creditor would be mere conjecture. As a result, the Debtor believe all creditors will receive more pursuant to the Plan than if this case were converted to a case under Chapter 7.

**IX.** **CONTEMPLATED LITIGATION.**

The Debtor contemplates that litigation may be necessary to remove certain improper liens from its assets. In addition, the Debtor contemplates the continuation of other smaller collection foreclosure, evictions and real estate related actions against third parties. The Debtor reserves the right to commence any such litigation that related to claims that arose before the Effective Date of the Plan, for a period of one (1) year following the Effective Date of the Plan. Finally, the Debtor reserves the right to object to any claim for a period up to and including sixty (60) days following the Effective Date of the Plan, and to thereafter pursue any litigation that may arise there from.

The Debtor does not contemplate any litigation to recover pre-petition transfers or payments as preferential or fraudulent (also known as avoidance claims), as the Debtor believes and its schedules demonstrate that DNT was not insolvent at the time of the filing of its petition or in the years that proceeded the filing of it Chapter 11 petition. Insolvency (in the absence of actual fraud) is a requirement to recovery of most, if not all, avoidance claims.

**X.** **TAX CONSEQUENCES OF THE PLAN.**

Implementation of the Plan may have significant tax consequences to the shareholders and all other classes of creditors. SAID PERSONS AND ENTITIES SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF IMPLEMENTATION OF THE PLAN.

Although creditors and parties in interest should rely solely upon their tax advisors for advice regarding the tax consequences and implications of the Plan, the Debtor believes that the

following comments and opinions may be useful in considering any such consequences and implications. The following comments and opinions have not been reviewed or passed upon by an accountant, attorney or other tax professional. The Debtor is unable to warrant or represent that any of the information, comments or opinions contained herein are without any inaccuracy.

If consummated, the Plan may result in debt discharge for certain creditors, which in turn, might result in the recognition of income. Should the implementation of the Plan result in the discharge of indebtedness or be treated as such, the debt so discharged may be recognized as income to the Debtor under § 108 of the Internal Revenue Code. This basic rule is subject to numerous exceptions and modifications in § 108 and other sections of the Internal Revenue Code.

## XI.        REFERENCE TO PLAN.

All creditors and other parties in interest should review carefully the "Debtor's Plan of Reorganization" filed contemporaneously with this Disclosure Statement, for the specific treatment of any claim or class of claims. In the event of any discrepancy with this Disclosure Statement, the terms of the Plan shall control. All information contained in this Disclosure Statement, unless otherwise noted herein, has been obtained from the records of the Debtor and assembled by its staff. NO STATEMENT OR REPRESENTATION MADE WITH RESPECT TO THE DEBTOR, THE ESTATE AND ITS ASSETS, THE PLAN OR THIS DISCLOSURE STATEMENT IS AUTHORIZED EXCEPT AS CONTAINED HEREIN OR CONSISTENT WITH THE EXPRESS TERMS OF THE PLAN. ALL CREDITORS AND PARTIES IN INTEREST ARE URGED TO REVIEW THE PLAN WITH THEIR OWN COUNSEL.

ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN WHAT IS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU. YOU SHOULD REPORT ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS TO COUNSEL FOR THE DEBTOR, GIBSON, NAKAMURA & GREEN, P.L.L.C., 2329 N. TUCSON BLVD, TUCSON, ARIZONA 85716,

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

(520) 722-2600. COUNSEL, IN TURN, WILL INFORM THE COURT, WHICH MAY TAKE SUCH ACTION, AS IT DEEMS APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN REVIEWED OR PASSED UPON BY AN ACCOUNTANT. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE IN EVERY RESPECT, ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THE BEST OF THE DEBTOR'S INFORMATION, KNOWLEDGE AND BELIEF.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN REVIEWED OR VERIFIED BY GIBSON, NAKAMURA & GREEN, P.L.L.C., BANKRUPTCY COUNSEL FOR THE DEBTOR. GIBSON, NAKAMURA & GREEN, P.L.L.C. HAS RELIED UPON INFORMATION SUPPLIED BY THE DEBTOR, AND ON SUCH OTHER MATTERS AS HAVE COME TO THE ATTENTION OF THE ATTORNEYS PREPARING THIS DISCLOSURE STATEMENT AS ARE DISCLOSED HEREIN. GIBSON, NAKAMURA & GREEN, P.L.L.C. DOES BELIEVE THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE TO THE BEST OF ITS KNOWLEDGE AND INFORMATION.

THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN, AND THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE COURT ENDORSES OR APPROVES THE PLAN, BUT ONLY THAT THIS INFORMATION IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS AND INTEREST-HOLDERS TO MAKE INFORMED DECISIONS WHETHER TO APPROVE OR TO REJECT THE PLAN.

## XII.        MANNER OF VOTING ON PLAN.

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the ballot for accepting or rejecting the Plan (the "Ballot")

LAW OFFICES
**GIBSON, NAKAMURA & GREEN, P.L.L.C.**
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

accompanying this Disclosure Statement and filing and/or sending the Ballot as directed in the Order Approving this Disclosure Statement transmitted herewith.

**XIII.**   **CONFIRMATION OF PLAN.**

      **A.**   **SOLICITATION OF ACCEPTANCES.**

This Disclosure Statement has been approved by the Bankruptcy Court in accordance with Bankruptcy Code § 1125. This Disclosure Statement is intended to assist creditors in evaluating the Plan and determining whether to accept or reject the Plan. Under the Bankruptcy Code, votes with regard to the Plan cannot be solicited unless a copy of this Disclosure Statement, previously approved by the Bankruptcy Court, is furnished prior to or concurrently with such solicitation.

      **B.**   **HEARING ON CONFIRMATION OF PLAN.**

The Bankruptcy Court has set _____, 2010, at _____ o'clock ___.m., as the time for hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied. Each creditor and equity security holder will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's Notice of Hearing on Confirmation of Plan.

      **C.**   **ACCEPTANCES NECESSARY TO CONFIRM PLAN.**

At the confirmation hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by each class of creditors or equity security holders whose claims or interests are impaired under the Plan. Pursuant to Bankruptcy Code § 1126, an impaired class is deemed to have accepted the Plan if (i) at least two-thirds in amount and (ii) more than one-half in number of the allowed claims or interests who have voted on the Plan have voted to accept it.

**D. CONFIRMATION POSSIBLE WHERE CLASS DOES NOT ACCEPT.**

Even if an impaired class of claims or interests does not accept the Plan, the Court may nevertheless confirm the Plan. To do so, the Court must find that the Plan: (1) is fair and equitable with respect to each class of claims or interest that is impaired and has not accepted the Plan; and (2) that each holder of a claim or interest receives or retains under the Plan, an account of such claim or interest, property of a value, as of the effective date of the Plan, that is not less than the amount that would be received or retained if the estate was liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes that these requirements, among others, are satisfied under the Plan, in that all classes of creditors, other than the shareholders of the Debtor, shall receive payment in full of their claims.

**XIV. CONCLUSION AND RECOMMENDATION.**

The Debtor believes that their Plan provides the greatest likelihood for the payment of both secured and unsecured creditors and therefore believes that acceptance of the Plan is in the best interest of each and every class of creditors. Accordingly, the Debtor recommends acceptance of the proposed Plan of Reorganization.

DATED this 6th day of April, 2010.

GIBSON, NAKAMURA & GREEN, P.L.L.C.

By: /s/ Scott D. Gibson (007395)
Scott D. Gibson
Kristen M. Green
Attorneys for Debtor

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

LAW OFFICES
**GIBSON, NAKAMURA & GREEN, P.L.L.C.**
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

1
2

Copy of the foregoing
mailed this 6th day
of April, 2010, to:

3

Elizabeth C. Amorosi
United States Trustee
230 N. First Ave., Suite 204
Phoenix, AZ  85003

Nancy J. March
DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 E. Broadway Blvd., #200
Tucson, AZ  85716
Attorneys for RMKM Family Ltd Partnership

4
5

Howard A. Chorost
21 E. Speedway Boulevard
Tucson, AZ  85705
Attorney for Vantage West Credit Union

American Home Mortgage Services, Inc.
1525 S. Beltline Road, Suite 100 N
Coppell, TX  75019
Creditor

6
7
8

Clifford B. Altfeld
ALTFELD, BATTAILE & GOLDMAN, P.C.
250 N. Meyer Ave.
Tucson, AZ  87501
Attorneys for Canyon Community Bank

Dennis J. Clancy
RAVEN, CLANCY, & McDONAGH, P.C.
313 South Convent
Tucson, AZ  85701
Attorneys for CNH Capital America, LLC

9
10
11

Troy E. Larkin
PIMA COUNTY ATTORNEY
Civil Division
32 N. Stone Ave., Suite 2100
Tucson, AZ  85701

Maria Tsagaris
MCCALLA RAYMER, LLC
1544 Old Alabama Road
Roswell, GA  30076-2102
Attorneys for Litton Loan Servicing, L.P.

12
13
14

Clyde Gavin
7240 S. Camino Mirlo
Tucson, AZ  85747
Creditor

Dennis A. Rosen
LAW OFFICES OF DENNIS A. ROSEN
1670 E. River Road, Suite 124
Tucson, AZ  85718
Attorneys for Creditors John Munic Enterprises,
Creditors Rosen, and Creditor Kennedy

15
16
17

Hilary B. Bonial
F# 7745-N-3145
9441 LBJ Freeway, Suite 350
Dallas, TX  75243
Attorney for Specialized Loan Servicing, LLC
    And American Home Mortgage Servicing, Inc.

Gerard O'Meara
GUST ROSENFELD, PLC
1 S. Church Ave., Suite 1900
Tucson, AZ  85701-1620
Attorneys for Alaska Seaboard Partners, L.P.

18
19
20

Specialized Loan Servicing, LLC
8742 Lucent Blvd., Suite 300
Highlands Ranch, CO  80129
Creditor

21
22

By:  /s/ Linda Caputo

23

DEED AND NOTE TRADERS\DISCLOSURE
STATEMENT- DNT 021710
04/6/10 2:43 PM

# EXHIBIT "1"

LAW OFFICES
# GIBSON, NAKAMURA & GREEN, P.L.L.C.
**2329 N. TUCSON BLVD.**
**TUCSON, ARIZONA 85716**
**(520) 722-2600**

Scott D. Gibson, SBN 007395
Kristen M. Green, SBN 019802
ecf@gnglaw.com
Attorneys for Debtor

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

In re

DEED AND NOTE TRADERS, L.L.C.,

Debtor.

In Proceedings Under
Chapter 11

NO. 4-10-bk-03640-EWH

## DEBTOR'S PLAN OF REORGANIZATION

## DATED APRIL 2, 2010

DNT\PLAN 021710.doc
04/6/10 2:42 PM

GIBSON, NAKAMURA & GREEN, P.L.L.C.
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

Deed and Note Traders, L.L.C., the Debtor-in-Possession in this Chapter 11 case, hereby submits the following Plan of Reorganization pursuant to 11 U.S.C. § 1121, and requests confirmation of this Plan of Reorganization pursuant to 11 U.S.C. § 1129(a) and (b).

## ARTICLE 1

## DEFINITIONS

**1.1** **"Administrative Claim"** shall mean any costs or expenses of administration of the case allowed under 11 U.S.C. § 503(b), including, without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses of operating the business of the Debtor including, without limitation, loans or other advances to the Debtor, as Debtor-in-Possession, all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under § 330 of the Bankruptcy Code, and any fees or charges assessed against the Debtor's estate under Chapter 123, Title 28, United States Code.

**1.2** **"Allowed Claim"** shall mean every Claim: (a)(i) for which a proof of claim is filed within the time fixed by the Court; or (ii) that has been, or hereafter is listed by the Debtor, liquidated in amount and not disputed or contingent, and, in either event; (b)(i) to which no objection to the allowance thereof has been filed within the period fixed by the Court with respect to the Plan, or (ii) as to which the order allowing such Claim has become final and non-appealable. Unless otherwise specified in this Plan, "Allowed Claim" shall not include any interest on the principal amount of such Claim maturing or accruing from and after the Petition Date.

**1.3** **"Allowed Secured Claim"** shall mean the Allowed Amount of a Claim secured by a lien, security interest, encumbrance, or other charge{s} against any interest of the Debtor in any property of the estate (as defined in 11 U.S.C. § 541), which lien, security interest, encumbrance, or other charge(s) is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Code or other applicable non-bankruptcy law, to the extent of the

value of the interest of the holder of such Allowed Claim in such property as determined in accordance with 11 U.S.C. §§ 506(a) and (b).

**1.4** **"Allowed Unsecured Claim"** shall mean the Allowed Amount of a Claim that is liquidated, matured, and non-contingent, for which the claimant holds no security for the repayment thereof.

**1.5** **"Bankruptcy Court"** means the United States District Court for the District of Arizona, having jurisdiction over this case and, to the extent of any reference made to 28 U.S.C. § 157, the unit of such District Court constituted pursuant to 28 U.S.C. § 151.

**1.6** **"Bankruptcy Code"** shall mean the United States Bankruptcy Code, 11 U.S.C. § 101, et seq.

**1.7** **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, as amended and promulgated under 28 U.S.C. § 2075.

**1.8** **"Business Day"** shall mean a day of the year on which commercial banks are not required or authorized to close for business in Tucson, Arizona.

**1.9** **"Capital Expenditures"** shall mean, for any period, the aggregate of all expenditures, during such period, which, in accordance with GAAP, are required to be included in property, plant, equipment, or another fixed-asset account.

**1.10** **"Capital Receipts"** shall mean (i) the net sales proceeds from the sale of any of the Debtor's tangible assets, or (ii) the funds realized from the refinancing of the indebtedness secured by any of the Debtor's tangible assets; (iii) the proceeds of the condemnation of or taking by power of eminent domain of all or any portion of the Debtor's tangible assets, and/or (iv) the proceeds of any title or fire insurance on any of the Debtor's tangible assets.

**1.11** **"Claim"** shall mean any right of payment which is evidenced by a proof of claim or application for payment or compensation that was: (i) timely filed; or (ii) deemed filed

pursuant to 11 U.S.C. § 1111(a); or (iii) filed late with leave of Court after notice and opportunity for hearing were provided to the Debtor.

**1.12** **"Confirmation"** shall mean the entry of an order of the Bankruptcy Court confirming the Debtor's Plan of Reorganization.

**1.13** **"Debtor"** shall mean Deed and Note Traders, L.L.C., an Arizona limited liability company.

**1.14** **"Effective Date"** shall mean the first (1st) Business Day following the date on which the Final Order of Confirmation is entered.

**1.15** **"Estate Assets"** shall mean the Debtor's interest in all real or personal property, tangible or intangible, as of the Petition Date, including but not limited to accounts, contract rights, furniture, fixtures, equipment, inventory, as well as the goodwill and "going concern value" of the Debtor's operating business.

**1.16** **"Final Order"** shall mean an order of the Bankruptcy Court as to which: (i) the time for appeal has expired; or (ii) any appeal that has been filed has been finally resolved or dismissed. Notwithstanding the foregoing, an order confirming this Plan, and any order approving any disclosure statement relating to this Plan shall be a "Final Order" whether or not an appeal has been filed, so long as no stay of such Order has been issued and remains in effect.

**1.17** **"First Chapter 11 Case"** shall be the proceeding under Chapter 11 of Title 11 U.S.C., commenced by the Debtor on September 7, 2007 before the United State Bankruptcy Court for the District of Arizona.

**1.18** **"First Plan"** shall mean the Second Amended Plan of Reorganization for the Debtor confirmed by the Court in the First Chapter 11 Case by Order dated October 23, 2008.

**1.19** **"GAAP"** shall mean generally accepted accounting principles in the United States of America, as in effect from time to time.

GIBSON, NAKAMURA & GREEN, P.L.L.C.
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

GIBSON, NAKAMURA & GREEN, P.L.L.C.

LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

**1.20** **"Gross Receipts"** shall mean, for any period, all cash receipts of the Debtor generated from the operation of the Debtor's business during such period other than (i) Capital Receipts realized in respect of the Debtor's business, (ii) contributions to the capital of the Debtor by any shareholder from and after the Effective Date, and (iii) any loans made by any shareholder of the Debtor to the Debtor after the Petition Date.

**1.21** **"Net Cash Flow"** shall mean, for any period, an amount equal to the Gross Receipts of the Debtor during such period, computed on a cash basis, reduced by all expenditures of the Debtor during such period, which expenditures shall include, without limitation, (a) payment of all Operating Expenses of the Debtor, and (b) Capital Expenditures, if any, by the Debtor, to the extent not paid out of the proceeds of Capital Receipts, or out of the proceeds of contributions to the capital of the Debtor or loans by the Debtor's shareholders or a third party to the Debtor; provided, however, that the aggregate of any such Capital Expenditures paid out of Gross Receipts shall be reasonable and appropriate for operation of the Debtor's business.

**1.22** **"Operating Expenses"** shall mean all expenses of any kind incurred by the Debtor in connection with the operation of its business, including, without limitation, salaries, taxes, and benefits for on-site management personnel, administrative services, advertising and promotional costs and expenses, taxes, insurance, escrow payments, repair and maintenance expenses, and management fees. Legal, accounting, and other costs and expenses of the Debtor incurred in connection with the administration of the Debtor shall constitute Operating Expenses.

**1.23** **"Operating Reserve"** shall mean a reserve deposit account to be established, funded and managed by the Debtor. The Operating Reserve may be used by the Debtor to pay ordinary and necessary Operating Expenses, Capital Expenditures, or, at the discretion of the Reorganized Debtor, to expedite payments to the holders of any class of Claims under the Plan. The Operating Reserve shall be initially funded up to the Operating Reserve

GIBSON, NAKAMURA & GREEN, P.L.L.C.

LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

Requirement on the Effective Date, and shall be replenished each month, up to the Operating Reserve Requirement, from Net Cash Flow, if available.

     **1.24** **"Operating Reserve Requirement"** shall mean a sum equal to the funds on deposit in the Debtor's operating accounts on the Effective Date, which sum is estimated to be approximately $275,000-$300,000.

     **1.25** **"Outstanding Principal"** shall mean, an amount equal to the sum of (1) the fair market value of the real assets of the Debtor as of the Effective date; <u>less</u> (2) the sum of all payments made to the holder of any Allowed Secured Claim from and after the Petition Date to Effective Date. The Outstanding Principal shall not include any interest accruing on the Class 4 Allowed Secured Claims between the Petition Date and the Effective Date nor any penalty or default interest or late charges accruing prior to the Effective Date which may be claimed or provided fro under the Note. The Outstanding Principal shall also not include any attorneys' fees or expenses incurred by the holders Class 4 Claims after the Petition Date through and including the Effective date, except to the extent permitted under Bankruptcy Code sec. 506.

     **1.26** **"Petition Date"** shall mean September 7, 2007, the date that the Voluntary Petition for relief was filed by the Debtor commencing this chapter 11 case.

     **1.27** **"Plan"** shall mean this Plan of Reorganization filed on behalf of the Debtor and any and all modifications thereof.

     **1.28** **"Plan Fund"** shall mean a fund of money to be deposited into an interest-bearing deposit account for the exclusive use by the Debtor to pay Class 6 Claims. The Plan Fund shall be funded initially from all cash on hand as of the Effective Date, less (i) funds required to pay Claims payable as of the Effective Date in accordance with the Plan and (ii) funds necessary to establish the Operating Reserve up to the Operating Reserve Requirement. On or before the 20th day of each month, the Debtor shall deposit all Excess Net Cash Flow (Net Cash

Flow less payments to the Class 3 and 4 claimants and funds necessary to replenish the Operating Reserve to the Operating Reserve Requirement) into the Plan Fund.

## ARTICLE 2

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The Allowed Claims of the Creditors of the Estate shall be classified as follows:

**2.1** **Class 1 Claims.** The Claims classified as Class 1 Claims shall consist of all Allowed Administrative Claims.

**2.2** **Class 2 Claim.** The Claims classified as Class 2 Claims shall consist of all Unsecured Claims that are entitled to priority under §§ 507(a)(3) through (10) of the Bankruptcy Code to the extent, if any, that said section of the Bankruptcy Code applies in this case.

**2.3** **Class 3 Claims.** The Claims classified as Class 3 Claims shall consist of all Secured Claims that are secured by vehicles or equipments of the Debtor.

**2.4** **Class 4 Claims.** The Claims classified as the Class 4 Claims shall consist of the Real Property Secured Claims not otherwise classified under the Plan.

**2.5** **Class 5 Claims.** The Claims classified as Class 5 Claims shall consist of all Real Property Secured Claims identified on Exhibit "A" attached hereto.

**2.6** **Class 6 Claims**. The Claims classified as the Class 6 Claims shall consist of all general Unsecured Claims

**2.7** **Class 7 Interest.** The Interests classified as the Class 7 Interests shall consist of the equity ownership interests of the members of the Debtor.

LAW OFFICES
**GIBSON, NAKAMURA & GREEN, P.L.L.C.**
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

# ARTICLE 3

## TREATMENT OF CLASS 1 CLAIMS

## (ADMINISTRATIVE CLAIMS)

Every Class 1 Claim, as and when it is an Allowed Claim, will be treated as follows pursuant to this Plan:

**3.1** Every such Claim shall be paid fully and in cash on the Effective Date, unless arrangements for a later repayment are made with the claimant or ordered by the Court; provided, however, that Administrative Expenses representing (a) liabilities incurred in the ordinary course of business of the Debtor, as Debtor-in-Possession or (b) liabilities arising under loans or advances to the Debtor, as Debtor-in-Possession, whether or not incurred in the ordinary course of business, shall be paid by the Debtor in accordance with the terms and provisions of the particular transactions and any agreements relating thereto.

**3.2** Class 1 Claims are <u>unimpaired</u> pursuant to this Plan.

# ARTICLE 4

## TREATMENT OF CLASS 2 CLAIM

## (PRIORITY UNSECURED CLAIMS)

Every Class 2 Claim as and when it is an Allowed Claim, will be treated as follows pursuant to this Plan:

**4.1** Every such Claim arising under Sections 507(a)(3) through (10) of the Bankruptcy Code, to whatever extent (if any) that such Claim exists, will be paid in full and in cash on the Effective Date, unless arrangements for later payment are made with the creditor or ordered by the Court. Allowed unsecured priority tax claims arising under Section 507(a)(8) of the Bankruptcy Code shall be paid in full in deferred cash payments together with interest thereon at the applicable statutory rate interest per annum, in equal quarterly installments, amortized over a period of five (5) years from the Petition Date.

DNT\PLAN 021710.doc
04/6/10 2:42 PM

8

**4.2** Class 2 Claims are <u>unimpaired</u> pursuant to this Plan.

## ARTICLE 5

## TREATMENT OF CLASS 3 CLAIMS

The Class 3 Claims, as and when it becomes an Allowed Secured Claim, shall be treated as follows under the Plan:

**5.1** The Class 3 Claimants shall retain their lien and security interest in and to the collateral securing said Claim, and all other terms and conditions of the loan and security documents evidencing such Claim will remain unchanged except as modified by this Plan. The Allowed Amount of the Class 3 Allowed Secured Claim shall be paid as follows:

        **a.** **<u>Payment of the Class 3 Claim.</u>** All terms and conditions of the First Plan relating to the claims of the Class 3 creditors will remain unchanged, except that any payments in arrears as of the Effective Date of the Plan shall be added to the end of the payment term of the First Plan and paid until the claim is paid in full, with interest as provided in the First Plan

        **b.** **<u>Default Interest, Late Fees and Other Charges.</u>** The Class 3 Claimant shall not be entitle to any default interest, late fee or other charges assets because of a default that occurred after the Petition Date through and including the Effective Date.

**5.2** Class 3 Claims are <u>impaired</u> pursuant to this Plan.

## ARTICLE 6

## TREATMENT OF CLASS 4 CLAIMS

Every Class 4 Claim, as and when it is an Allowed Claim, will be treated as follows pursuant to this Plan:

**6.1** The Class 4 Claimants shall retain their lien and security interest in and to the real property securing said Claim. The Allowed Amount of the Class 4 Allowed Secured Claim shall be paid as follows:

LAW OFFICES

**GIBSON, NAKAMURA & GREEN, P.L.L.C.**

2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

### a.    **Payment of Interest**.

The holder of the Class        s 4 Allowed Secured Claims shall receive deferred interest only cash payments based upon the amount of the Outstanding Principal of each such claim, as of the Effective Date calculated at the rate set forth in the first Plan. Commencing on the 1st day of the second calendar month following the Effective Date and on the 1st day of each month thereafter for the remaining term of the payment obligations under the First Plan, interest shall be payable in arrears to the holders of Class 4 Claims.

### b.    **Payment of Principal**.

Upon the earliest to occur of (i) the expiration of the Plan Period, (ii) the sale of the collateral for a Class 4 Claim , or (ii) the refinancing of the indebtedness for any Class 4 Claim, or (iii) the original maturity date for each Class 4 Claim set forth in the First Plan, the entire amount of the then Outstanding Principal of the Class 4 Claims and all accrued but unpaid interest thereon shall be due and payable in full; provided, ho due and payable in full.

### c.    **Calculation of Interest**.

Interest on the Class 4 Claims shall be paid in arrears and shall be calculated on the basis of a 365-day year.

### d.    **Optional Prepayment of the Pacific Mutual Note**.

The Class 4 Claims shall be pre-payable in whole or in part, without premium or penalty, at any time.

**6.2**    The Class 4 Claims is _impaired_ pursuant to the Plan.

## ARTICLE 7

## TREATMENT OF CLASS 5 CLAIMS

## (SURRENDER OF COLLATERAL)

Every Class 5 Claim, as and when it is an Allowed Claim, will be treated as follows pursuant to this Plan:

**7.1**    The Class 5 claims will be the secured claimants holding liens on the parcels of real property identified in Exhibit "A" attached hereto. The real property securing the claims of the Class 5 Claimants shall be surrendered to the Claimants upon the Effective Date of the Plan by

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

GIBSON, NAKAMURA & GREEN, P.L.L.C.
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

way of a deed in lieu of foreclosure. All rents from the real property securing the Class 5 Claimants shall remain with the Debtor to cover the costs associated with the Property while in the Possession of the Debtor. Any Class 5 Claimant wishing to take title to the Class 5 Property prior to the Effective Date shall make a request therefore to the Debtor and shall receive a Deed to the collateral; provided however, in exchange for such early surrender, any such Class 5 Claimant must agree to release any claim it may have for a deficiency against the Debtor with respect to the Class 5 Property only. Class 5 Claimants that wait until the Effective Date to receive the title to the collateral shall have the right to a assert an unsecured claim for any deficiency, provided a Proof of Claim supported by an appraisal prepared by a licensed appraiser is filed no later than thirty (30) following the Effective Date. The Debtor shall thereafter have thirty (30) days thereafter to object to such claim, otherwise it shall be deemed allowed and paid as a Class 6 Claim. In the case of more than one holder of a Class 5 Secured Claim against the surrendered property, the property shall be deed to the holder of the junior or subordinate lien against the property. In the event the Debtor holds a rental or earnest money deposit from the current occupant of the premises to be surrendered, such deposit shall be surrendered: (i) to the holder of the Class 5 claim receiving the title to the Property, to the extent such holder assumes the rental or purchase agreement applicable to such property, with such deposit to be turned over at the termination of the tenancy and or the closing of the sale of such property; or (ii) to the occupant of the premises, to the extent the lease or option for the property is rejected by the Debtor. The refund of any Deposit shall not include any amount that was to be credited to a down payment as "rent credits". The Debtor reserves the right to add to or subtract from the properties included in Class 5 at any time prior to confirmation. If excluded from Class 5, the claim will be paid as a Class 4 Claim.

Included in the Class 5 Claims shall be those secured creditors who were classified as Class 5 Creditors in the First Plan, who failed to record the Deeds tendered to them under the Order confirming the First Plan, except that such creditors shall have no right to a deficiency claim under

this Plan ( such claim having been effectively waived under applicable Arizona law). In the event any Class 5 Creditor shall fail to record a Deed tendered pursuant to this Plan within thirty (30) days following the Effective Date, the Debtor shall be authorized to record such Deed without the consent of the holder of the Class 5 Claim, and such recordation shall be binding upon any such Class 5 Claimant.

**7.2**     The Class 6 Claims are <u>impaired</u> under the Plan

## ARTICLE 8

## TREATMENT OF CLASS 6 CLAIMS

## (GENERAL UNSECURED CLAIMS)

Every Class 6 Claim, as and when it is an Allowed Claim, will be treated as follows pursuant to this Plan:

**8.1**     After payment in full of the Claims in Classes 1 and 2, each and every Class 5 Claim will be paid in full, in cash, in semi-annual installments in a pro rata amount from the Plan Fund, together with interest thereon at the federal judgment rate in effect from time to time. Class 5 Claims shall not include any interest charges, fees, or other costs incurred or assessed after the Petition Date through and including the Effective Date.

**8.2**     The Class 5 Claims are <u>impaired</u> pursuant to this Plan.

## ARTICLE 9

## TREATMENT OF CLASS 7 INTERESTS

## (INTEREST HOLDERS)

Every Class 7 Interest, as and when it is an Allowed Interest, will be treated as follows pursuant to this Plan:

**9.1**     The member shall retain their interests in the Company, but shall receive nothing of value on account of the interest until all allowed Claims in Classes 1, 2 and 6 have been paid in full.

LAW OFFICES

**GIBSON, NAKAMURA & GREEN, P.L.L.C.**

2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

GIBSON, NAKAMURA & GREEN, P.L.L.C.

LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

**9.2**     The Class 7 Interests are <u>impaired</u> pursuant to this Plan.

## ARTICLE 10

## IMPLEMENTATION OF THE PLAN

Upon Confirmation of the Plan, all of the assets of the Debtor's estate shall be vested in the Debtor and the Debtor shall continue to control, manage, and operate its business. Debtor shall use the proceeds from the operation of the business to pay the normal operating expenses necessary for the continued, uninterrupted operation of the business.  Debtor shall pay all expenses of the business, including taxes and insurance costs, on a current basis. Responsibility for the day-to-day management of the Debtor is vested in the Debtor.

## ARTICLE 11

## EXECUTORY CONTRACTS

Unless rejected prior to the Confirmation Date, or under the Plan, the Debtor hereby expressly assumes all executory contracts to which the Debtor is a party, including, without limitation, any unexpired leases.

## ARTICLE 12

## AMENDMENTS

Debtor may propose amendments to or modifications of the Plan at any time prior to Confirmation of the Plan with the leave of the Bankruptcy Court or as permitted by the Bankruptcy Code or Bankruptcy Rules.  After Confirmation of the Plan, the Debtor may amend or modify the Plan, with the approval of the Bankruptcy Court, so long as it does not materially or adversely affect the interests of creditors or other parties in interest as set forth herein, to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Order of Confirmation, in such a manner as may be necessary to carry out the purposes and intent of the Plan.

DNT\PLAN 021710.doc
04/6/10 2:42 PM

GIBSON, NAKAMURA & GREEN, P.L.L.C.
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

# ARTICLE 13

## EVENTS OF DEFAULT

The Debtor's failure or refusal to make or perform, when due, all or any part of the payments or obligations required to be made or performed by the Debtor pursuant to this Plan, within ten (10) days after the date such payment or performance is due, shall constitute an Event of Default under this Plan. Upon the occurrence of an Event of Default and Debtor's failure to cure same within ten (10) days from the date of receipt of a written notice specifying the nature of said Event of Default and the specific action required to cure same, any party affected by such Event of Default shall be free to pursue any and all of its rights and remedies against the Debtor as the same may be modified by this Plan. Written notice of an Event of Default shall be sent to the Debtor by United States certified mail, return receipt requested, first class postage prepaid, to the following address:

> Deed and Note Traders, L.L.C.
> 1310 N Alvernon Way
> TUCSON, ARIZONA 85712

with a copy by certified mail to:

> Gibson, Nakamura & Green, P.L.L.C.
> 2329 N. Tucson Blvd
> Tucson, Arizona 85716
> Attn: Kristen Green
>     Scott D. Gibson

# ARTICLE 14

## UNITED STATES TRUSTEE'S FEES

The quarterly fees required by 28 U.S.C. § 1930(a)(6) will be paid to, and reports will be filed with, the U. S. Trustee's Office until application is made for entry of a final decree. Application for a final decree can be made when the Plan has been fully administered, which for

DNT\PLAN 021710.doc
04/6/10 2:42 PM

14

GIBSON, NAKAMURA & GREEN, P.L.L.C.

LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

purposes of this Plan shall mean when the Plan has been substantially consummated, as that term is defined in § 1101(2) of the Bankruptcy Code.

## ARTICLE 15

## RETAINED JURISDICTION OF THE BANKRUPTCY COURT

Until this case under chapter 11 of the Bankruptcy Code is closed as set forth above, the Bankruptcy Court shall retain full jurisdiction, as provided in 28 U.S.C. § 1471, to carry out the provisions, purposes and intent of this Plan or any modification hereto, including, without limitation:

a.      Retention of jurisdiction over this reorganization case subject to the provisions of the Plan;

b.      Classification of the Claim of any creditor and re-examination of Claims that have been allowed for purposes of voting;

c.      Settlement or adjustment of any Claim or interest and determination of the extent and validity of the disputed, unliquidated, or contingent Claims as may be required, as well as determination of such objections to creditors' Claims as may be filed.  The failure of Debtor to object to or examine any Claim for the purpose of voting shall not be deemed to be a waiver of the Debtor's right to object to or re-examine the Claim in whole or in part at any time.

d.      Liquidation or estimation of damages or determination of the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim.

e.      Determination of all questions and disputes regarding title of the Estate Assets, and determination of all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the date of confirmation, between the Debtor and any party, including, but not limited to, any right of Debtor to recover assets or offset Claims pursuant to the provisions of Title 11 of the Code;

f.      Adjudication of all Claims or controversies arising out of purchases, sales, or contracts made or undertaken by Debtor during the pendency of the Chapter 11 case;

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

**g.**     Allowance or disallowance of all Claims affected by this Plan;

**h.**     Adjudication of any litigation commenced by Debtor to set aside or avoid any transfers pursuant to §§ 544, 545, 547, 548, 549, and/or 553 of the Code;

**i.**     The correction of any defect or the curing of any omission, or the reconciliation of any inconsistency in the Plan or the Order of Confirmation as may be necessary to carry out the purposes and intent of this Plan;

**j.**     Determination of the extent and validity of any Claim pursuant to § 506 of the Code;

**k.**     The modification of this Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code and the authorities given by the acceptance of this Plan;

**l.**     Enforcement and interpretation of the terms and conditions of this Plan;

**m.**     Entry of any order, including any injunction, necessary to enforce the title, rights, and powers of the Debtor and of the creditors under this Plan and to impose such limitations, restrictions, terms, and conditions of such titles, rights, and powers as the Bankruptcy Court may deem necessary;

**n.**     Entry of any order concluding or terminating this case;

**o.**     Reviewing any and all disbursements made through the Plan either by or on behalf of the Debtor.

DATED this 6th day of April, 2010.

GIBSON, NAKAMURA & GREEN, P.L.L.C.

By: _/s/ Scott D. Gibson (007395)_____
      Scott D. Gibson
      Kristen M. Green
      Attorneys for Debtor

DNT\PLAN 021710.doc
04/6/10 2:42 PM

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

1

2   Copy of the foregoing
    mailed this 6th day
3   of April, 2010, to:

4   Elizabeth C. Amorosi                    Nancy J. March
    United States Trustee                   DECONCINI MCDONALD YETWIN & LACY,
5   230 N. First Ave., Suite 204            P.C.
    Phoenix, AZ 85003                       2525 E. Broadway Blvd., #200
6                                           Tucson, AZ 85716
    Howard A. Chorost                       Attorneys for RMKM Family Ltd Partnership
7   21 E. Speedway Boulevard
    Tucson, AZ 85705                        American Home Mortgage Services, Inc.
8   Attorney for Vantage West Credit Union  1525 S. Beltline Road, Suite 100 N
                                            Coppell, TX 75019
9   Clifford B. Altfeld                     Creditor
    ALTFELD, BATTAILE & GOLDMAN, P.C.
10  250 N. Meyer Ave.                       Dennis J. Clancy
    Tucson, AZ 87501                        RAVEN, CLANCY, & McDONAGH, P.C.
11  Attorneys for Canyon Community Bank     313 South Convent
                                            Tucson, AZ 85701
12  Troy E. Larkin                          Attorneys for CNH Capital America LLC
    PIMA COUNTY ATTORNEY
13  Civil Division                          Maria Tsagaris
    32 N. Stone Ave., Suite 2100            MCCALLA RAYMER, LLC
14  Tucson, AZ 85701                        1544 Old Alabama Road
                                            Roswell, GA 30076-2102
15  Clyde Gavin                             Attorneys for Litton Loan Servicing, L.P.
    7240 S. Camino Mirlo
16  Tucson, AZ 85747                        Dennis A. Rosen
    Creditor                                LAW OFFICES OF DENNIS A. ROSEN
17                                          1670 E. River Road, Suite 124
    Hilary B. Bonial                        Tucson, AZ 85718
18  F# 7745-N-3145                          Attorneys for Creditors John Munic Enterprises,
    9441 LBJ Freeway, Suite 350             Creditors Rosen, and Creditor Kennedy
19  Dallas, TX 75243
    Attorney for Specialized Loan Servicing, LLC   Gerard O'Meara
20    And American Home Mortgage Servicing, Inc.   GUST ROSENFELD, PLC
                                            1 S. Church Ave., Suite 1900
21  Specialized Loan Servicing, LLC         Tucson, AZ 85701-1620
    8742 Lucent Blvd., Suite 300            Attorneys for Alaska Seaboard Partners, L.P.
22  Highlands Ranch, CO 80129
    Creditor
23

    By: /s/ Linda Caputo _____

DNT\PLAN 021710.doc
04/6/10 2:42 PM

# EXHIBIT "2"

**DEED AND NOTE TRADERS EMPLOYEES**
**04.01.10**

| EMPLOYEE NAME | WAGES | Salary/Hourly |
|---|---|---|
| David Kinas | $1,923.08 | Salary, Bi-weekly |
| Deanne Kinas | $1,550.00 | Salary, Bi-weekly |
| Nancy DiFebbo | $1,912.50 | Salary, Bi-weekly |
| Mabel Ramsey | $800.00 | Salary, Bi-weekly |
| Ingrid Velasquez | $12.50 | Hourly, 32 per wk |
| Eric Andrews | $18.32 | Hourly, 35-40 per wk |
| Martin Garcia | $11.83 | Hourly, 35-40 per wk |
| Robert Moses | $10.00 | Hourly, 35-40 per wk |