LAW OFFICES
**GIBSON, NAKAMURA & GREEN, P.L.L.C.**
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

Scott D. Gibson, SBN 007395
Kristen M. Green, SBN 019802
ecf@gnglaw.com
Attorneys for Debtor

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>DEED AND NOTE TRADERS, L.L.C.<br><br>Debtor. | In Proceedings Under Chapter 11<br><br>NO. 4-10-bk-03640-EWH<br><br>**FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION DATED APRIL 2, 2010** |

**I.      PURPOSE OF DISCLOSURE STATEMENT.**

The Debtor and Debtor-in-Possession, Deed and Note Traders, L.L.C.. (the "Debtor" or "DNT") is providing this Disclosure Statement (the "Disclosure Statement") to all of its known creditors and to its equity security holder pursuant to 11 U.S.C. § 1125 in order to permit them to make an informed judgment in exercising the right to vote on the Debtor's Plan of Reorganization dated April 2, 2010 (the "Plan") described below. A copy of the Plan is attached hereto as Exhibit "1". This Disclosure Statement is being furnished to all known creditors and equity security holders of the Debtor to inform them about the Plan and their rights with respect thereto.

## II. SOURCE OF INFORMATION.

The information contained herein has been compiled from records of the Debtor.

## III. STRUCTURE OF THE DEBTOR.

DNT Homes is an Arizona limited liability company created and formerly owned 100% by David Kinas and his family members ("Kinas"). Prior to 2006,, David Kinas was the sole owner of the debtor. In 2006, for estate planning purposes, a 99% ownership interest in the Debtor was transferred to a non-revocable spendthrift trust known as "The Kinas Family Trust" (the "Trust"). The Trustee of the Trust is David Kinas. The Beneficiaries of the Trust the are David Kinas and his descendants. A copy of the Trust Agreement for Trust may be obtained by contacting counsel for the Debtor. The Debtor was created in 1993 and since that time has been engaged the real estate business in Tucson, Arizona, primarily purchasing, leasing and selling residential properties. David Kinas, is the Manager of the Debtor and responsible for the day-to-day activities of the Debtor's business operations. Mr. Kinas is not a licensed real estate broker or agent. Ms. Kinas is a licensed real estate agent but not currently engaged in the active practice of real estate sales.

## IV. HISTORY OF THE DEBTOR.

### A. PREPETITION EVENTS.

Over the years, DNT has purchased, owned, rehabilitated, leased and sold hundreds of residential properties in Tucson and surrounding areas. Many, but not all of the properties were acquired by property owners in financial distress or purchased in actual foreclosures, although a fair number of properties were acquired through normal market transactions, including the purchase of a number of newly constructed production homes.

While DNT experienced the many ups and downs of the real estate market over the years, until mid-2007 it generally operated profitably with revenues drawn primarily from rental income and sales proceeds. Funding of property purchases came from a number of sources. In addition to its own operating income, DNT obtained many loans from private investors, which loans

would be secured by deed of trust liens on individual properties or groups of properties. Generally these loans were short-term high interest loans that allow DNT flexibility in acquiring properties on short notice. In most cases, after holding the property for a year or more, and after rehabbing the property, DNT would refinance the property with traditional lenders at market rates and hold the property for investment as a rental property. As its portfolio grew, and property values increased, DNT began engaging in more sales of its inventory.

DNT was always looking at ways to expand its presence in the real estate market, and offered many programs for buyers to acquire and/or remain in their homes despite poor credit records or while facing foreclosures. Such programs included rent-to-own contracts, whereby would-be buyers that could not qualify for traditional financing, would rent the property for a year or more, thereby enhancing their credit scores and enabling them to obtain financing. In many cases, DNT would carry the financing for the Homebuyer. In other programs, DNT would agree to take title to homes in foreclosure and rent the homes back to the occupants with an option to repurchase the homes in the future. While DNT believe these programs provided a needed and valuable service to consumers, because the homeowners were often experiencing extreme financial distress, these programs came under scrutiny by the Arizona Attorney General. After lengthy negotiations, in December 2006, DNT entered into a Consent decree wherein it agreed, *inter alia,* to sell a number of homes back to their original owners. In addition, DNT agreed to pay a large sum as and for attorney's fees incurred by the State. These payments and transactions came on the heels of a declining real estate market and practically eliminate any operating reserves previously held by DNT. Sales of properties dropped radically and essentially stopped in August, 2007, with the announcement of the shut down and bankruptcy filing of First Magnus Financial Corporation, a large provider of traditional and non-traditional residential loan programs. When faced with the virtual elimination of funding sources for the buyers who typically purchase DNT inventory, and the corresponding loss of sales revenue, DNT realized that it could not longer support its operations on

rental income alone and was forced into reorganization case under Title 11 in order to restructure its debt and reduce its cash flow requirements (the "First Chapter 11"). DNT successfully reorganized in the First Chapter 11 case and an Order Confirming the Debtor's Second Amended Plan Dated December 7, 2007 was entered by the Bankruptcy Court on October 23, 2008 (the "First Plan"). Under the First Plan, the payment terms of the secured claims of DNT's numerous creditors were modified to provide for interest only payments at a fixed annual rate of 5.6% (and somewhat higher for certain mortgages with less than a 20% equity cushion) over a period of seven years. The Plan in the First Chapter 11 case did not "cram down" the claims of any secured creditors in the traditional sense, in that the unpaid amounts of the claims of all secured creditors remained unchanged under the Plan. While the restructuring of the payment terms of the secured claims allowed DNT to remain current on its payments obligations to its secured creditors for a period of time post-confirmation, a continual decline in residential real property values in Tucson, Arizona, over the months following confirmation of the First Plan resulted in steadily declining rental rates for such properties. This in turn gradually resulted in the inability of DNT to continue to meet the debt service requirements under the First Plan. This case was filed for the sole purpose of valuing the Debtor's real estate assets under current market conditions and establishing the amount of the secured creditors claims under Bankruptcy Code §506 in light of such valuations. It is the intention of DNT to retain the payment terms established in the First Chapter 11 case and reduce the amount of the required payments based upon the amount of the secured claims following this valuation process. In addition, it is the intention of the Debtor to return certain non-performing properties to the secured lenders having liens in such properties where retention of such properties by DNT cannot occur without depleting the Debtor's operating reserves and sources of income and thereby subjecting its other properties to risk of loss.

## B. SUMMARY OF CURRENT OPERATIONS.

Upon the filing of the Debtor's Petition, DNT filed a number of Motions designed to preserve the status quo of its operations and to preserve and protect its properties pending the formulation of its plan of reorganizations. These Motions included a request to allow DNT to use its rental and other sources of income to fund normal operations, a motion authorizing payment of all insurance and tax impounds on its properties, a motion authorizing payment of "wrapped mortgages" or underlying debts on properties on which DNT held junior mortgages, and a motion authorizing sales and lease in the ordinary course of business. After notice and a hearing, these Motions were all granted (with certain limitations) by the Court and the Debtor has been operating its business as a Debtor-in-Possession since the filing.

Prior to the filing of its current Chapter 11 case, and to assist it in preserving its cash position, DNT ceased making all mortgage payments other than those for which it has sought court authorization to pay on an ongoing basis. It is DNT's intent to hold these funds in order to create an operating reserve to insure its successful emergence from Chapter 11. The filing of the First Chapter 11 case and the publicity over the Attorney General investigation and litigation has had an adverse effect on DNT's reputation and ability to effectively compete in the local rental property market. Accordingly, post confirmation, DNT has been utilizing a related entity, 881HOME, LLC, to conduct its rental operations. 881Home, LLC has no assets and merely acts as a rental agent for DNT. 881HOME collects rents on numerous properties owned by DNT, pays its direct out of pocket expenses associated with the rental activity (advertising, commissions [discussed below] etc.), and remits the balance of the rents to DNT. No fees are paid to 881Home, LLC by DNT.

Post-petition, the Debtor's operations have been similar in all respects to pre-petition activity. The employees of the Debtor, their salaries and job descriptions are attached as Exhibit "2" hereto ("Debtor's Employees"). The source of funding of the Employees of the Debtors is from "unencumbered funds" of the Debtor representing income from Notes and "wrap around mortgages"

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

as well as pre-petition cash balances. No employees, including the principals of the Debtor, David Kinas, or his spouse, Deanne Kinas, are receiving compensation from what would otherwise be "cash collateral" of any secured creditor. A history of the salary paid to Kinas and his wife is attached hereto as Exhibit "3", including any compensation paid by any affiliate of the Debtor. In addition, to compensation from the Debtor, (and as show on Exhibit "3") David Kinas receives a "commission", from its affiliate "881-Home, LLC" (which handles all the leasing and sales activity for the Debtor") equal to a total of 4% of all sales of company owned real estate. These commissions are paid at the rate of 1% of the sales price upon signing a sale contract, and 3% upon the closing of a sale. Mr. Kinas is the sole sales representative for the Debtors properties and no other person receives any commission in connection with any sale.

### V. **STATEMENT OF ASSETS AND LIABILITIES.**

Other than its cash reserves, office equipment, furniture, supplies and a few vehicles, the Debtor's assets consist primarily of its inventory of residential properties and notes receivable. Specifically as reflected in its Schedules of Assets, as of the filing date the Debtor owned 159 properties, and held notes with a face value of approximately $2,439,000. A Schedule of the Notes Receivable, Wrap Around Mortgages and Receivables from Affiliates is attached hereto as Exhibit "4". Since the Petition Date, the Debtor has confirmed that Notes payable to the Debtor by Olympic have were paid in full pre-petition. A schedule of the properties, the balances of the liens against each property, the estimated current market value, the monthly rental income (if any), and the occupancy status of each property is attached hereto as Exhibit "5". The estimated value of the real estate holding the Debtor intends to retain is $15,750,000, against which there are mortgages in the current amount of approximately $21,600,000. Secured creditors wishing to receive information on the status of their collateral, including the status of taxes and insurance, and the post-petition accrual of income may contact the Debtor at nancy@881home.com.

DNT has numerous secured lenders, both institutional and private. DNT's vehicles and equipment are all also subject to secured claims all as set forth in the Debtor's verified Schedules on file with the Bankruptcy Court. In addition to its secured debt, DNT has approximately $591,000 in general unsecured debt.

Debtor has a number of affiliates, created at various time for varying purposes. These Affiliates, and their respective owners, At are identified in Exhibit "6" attached hereto. Prior to the Petition Date, Judgments were obtained against the Trust, and Kinas by Wells Fargo Bank for unsecured obligations owing by the Debtor. After extensive litigation and settlement discussions the Wells Fargo Judgment was assigned to affiliate L19 Vaquero for an amount of approximately $210,000. The source of these funds was from the sale of assets by L19 Vaquero, and not from any funds of the Debtor. Either just prior to or immediately following the Petition Date, creditors Rosen and Munic obtain an uncontested default judgment against Kinas and his spouse for in excess of $1,000,000.000. This judgment remains secured by a number of assets of the Debtor and efforts are being made to reach a settlement between these creditors and Kinas without the necessity of Kinas filing his own Chapter 11 case. At present, negotiation is underway to allow Rosen and Munic, in lieu of a formal writ, to garnishment the wages of Kinas and his spouse in partial satisfaction of the Judgment they hold. Creditor Canyon Community Bank has also filed suit against Kinas on certain guarantees he executed in connection with loan made to the Debtor.

**VI.     DESCRIPTION OF THE PLAN.**

The following is a brief summary of the more significant provisions of the Plan. This summary is qualified in its entirety by the full text of the Plan, which all creditors and equity security holders are urged to read carefully. The Plan, if confirmed, will be binding upon the Debtor, its creditors and the equity security holder. The capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them by the Plan.

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

**A.  CLASSIFICATION AND TREATMENT OF CLAIMS.**

The Plan divides all claims into eight separate classes as follows:

**Class 1**. Class 1 consists of all Administrative Claims. These Claims, as and when each is an Allowed Claim, will be paid in full and in cash on the Effective Date, unless arrangements for later payments are made with the creditor or ordered by the Court. Class 1 Claims are unimpaired under the Plan.

**Class 2**. Class 2 consists of all Claims that are entitled to priority under Bankruptcy Code § 507(a)(3) through (10), to whatever extent (if any) that such Claims exist. Every Class 2 shall be paid in full, and in cash, in quarterly installments as and when funds are available in the Debtor's Non-Collateral Account, but in any event, not later than a date which is three years following the Effective Date of the Plan. Debtors are unaware of the existence of any Class 2 claims.  Secured claims for real property taxes shall be paid as Class 4 Claims but with interest at the statutory rate. Class 2 claims are impaired under the Plan.

**Class 3**. Class 3 consists of all Allowed Secured Claims which are those claims secured by liens on vehicles or equipment owned by the Debtor. The holders of the Class 3 Claims shall retain their liens and security interests in and to the assets of the Debtor. All terms and conditions of the confirmed plan in the First Chapter11 Case (the "First Plan") relating to the claims of the Class 3 creditors will remain unchanged, except that any payments in arrears as of the Effective Date of the Plan shall be added to the end of the payment term of the First Plan and paid until the claim is paid in full, with interest as provided in the First Plan

**Class 4**. Class 4 consists of all real estate secured claims not otherwise classified under the Plan. The Class 4 Claimants shall retain their lien and security interest in and to the real property securing said Claim, and all other terms and conditions regarding payment of the Class 4 Claims as set forth in the First Plan will remain unchanged except as modified by this Plan. The Allowed Amount of the Class 4 Allowed Secured Claim shall be paid deferred cash payments

aggregating the Outstanding Principal (defined in the Plan as the Fair market Value of the collateral securing each Class 4 Claims as of the Effective Date), together with simple interest accrued thereon from and after the Effective Date calculated at the rate of set forth in the First Plan. Under the First Plan, most secured claims are to be paid monthly interest only payments on the allowed amount of the unpaid principal balance of each secured loan, at the rate of simple interest of 5.6% (a few loans have a slightly higher rate) for a period of seven years from the Effective Date (approximately January 1, 2009) of the First Plan. The current Plan does not change these terms of payment Commencing on the 1st day of the second calendar month following the Effective Date and on the 1st day of each month thereafter for the remaining portion of the seven (or in some cases five) year term of the First Plan, interest shall be payable in arrears to the holders of the class 4 Claims. The Outstanding Principal Balance and all accrued and unpaid interest thereon as provided herein shall be due and payable as of the Maturity Date set forth in the First Plan.

The Class 4 Claims shall be pre-payable in whole or in part, without premium or penalty, at any time. The holders of Class 4 Claims shall not be entitled to any attorneys' fees or expenses incurred in connection with this Reorganization. The Class 4 Claims are impaired under the Plan.

**Class 5.** Class 5 consists of the secured claims of those claimants list in Exhibit "A" attached to the Plan. The real property securing the claims of the Class 5 Claimants shall be surrendered to the Claimants upon the Effective Date of the Plan by way of a deed in lieu of foreclosure. All rents from the real property securing the Class 5 Claimants shall remain with the Debtor to cover the costs associated with the Property while in the Possession of the Debtor. Any Class 5 Claimant wishing to take title to the Class 5 Property prior to the Effective Date shall make a request therefore to the Debtor and shall receive a Deed to the collateral; provided however, in exchange for such early surrender, any such Class 5 Claimant must agree to release any claim it may

have for a deficiency against the Debtor. Class 5 Claimants that wait until the Effective to receive the title to the collateral shall have the right to a assert an unsecured claim for any deficiency, to the extent such right exists, provided a Proof of Claim supported by an appraisal prepared by a licensed appraiser is filed no later than thirty (30) following the Effective date. The Debtor shall thereafter have thirty (30) days to object to such claim; otherwise it shall be deemed allowed and paid as a Class 6 Claim. In the event the Debtor holds a rental or earnest money deposit from the current occupant of the premises to be surrendered, such deposit shall be surrendered: (I) to the holder of the Class 5 claim receiving the title to the Property, to the extend such holder assumes the rental or purchase agreement applicable to such property, with such deposit to be turned over at the termination of the tenancy and or the closing of the sale of such property; or (ii) to the occupant of the premises, to the extent the lease or option for the property is rejected by the Debtor. The refund of any Deposit shall not include any amount that was to be credited to a down payment as "rent credits". The Debtor reserves the right to add to or subtract from the properties included in Class 5 at any time prior to confirmation. If excluded from Class 5, the claim will be paid as a Class 4 Claim. The Class 5 Claims are impaired under the Plan.

Included in the Class 5 Claims shall be those secured creditors who were classified as Class 5 Creditors in the First Plan, who failed to record the Deeds tendered to them under the Order confirming the First Plan, except that such creditors shall have no right to a deficiency claim under this Plan ( such claim having been effectively waived under applicable Arizona law). In the event any Class 5 Creditor shall fail to record a Deed tendered pursuant to this Plan within thirty (30) days following the, the Debtor shall be authorized to record such Deed without the consent of the holder of the Class 5 Claim, and such recordation shall be binding upon any such Class 5 Claimant.

**Class 6**. Class 6 consists of the general unsecured Claims. The Class 6 claims shall be paid in full, in cash, in semi-annual installments in a pro rata amount from the Plan Fund, together with interest thereon at the federal judgment rate in effect from time to time. Class 6

Claims shall not include any interest charges, fees, or other costs incurred or assessed after the Petition Date through and including the Effective Date. The Class 6 Claims are impaired pursuant to this Plan.

**Class 7**.  Class 7 consists of the equity ownership interest of the shareholder of the Debtor.  The existing shareholder of the Debtor shall not receive any distribution on account of his interest unless and until all sums due in Classes 1 2 and 6 are paid in full pursuant to the Plan.  The Class 7 Interest is impaired under the Plan.

### B. PROVISIONS FOR EXECUTION OF THE PLAN.

The Plan proposes that, upon confirmation, ownership of the assets of the Chapter 11 estate be vested in the Debtor and the Debtor shall continue to lease, sell and purchase homes in the manner it had done, and under the direction of the individuals in control of the Debtor during the administration of the case.  The Plan authorizes the Debtor to pay ordinary and necessary operating expenses in order to maintain a viable operation, including a reasonable salary to the officers and employees of the corporation, to the extent funds are available.  The Debtor projects that future management of the Debtor will consist of the same individuals, performing the same tasks for the same compensation as existed prior to conformation.  This will continue, at least until the unsecured claims in Class 6 have been paid in full.

Because it is unknown what value may ultimately be established for each property, it is impossible for the Debtor to provide any meaningful projections as to its income and expenses following the completion of the valuation process.  However, the Debtor believes, that based upon the values set forth in Schedule "C" of the Verified Schedules of Assets on file with the Bankruptcy Court, it will be able to fund the Plan from rental income, without any requirement that it rely upon income from sale of properties, although the Debtor intend to remain active in the sale of its properties when and where it is prudent for such activity.

On the Effective Date, the Reorganized Debtor shall establish a Plan Fund consisting

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA  85716
(520) 722-2600

of a separate, segregated interest-bearing deposit account, into which the Debtor shall deposit funds for distribution to Class 6 claimants as required by the Plan. The Plan Fund shall be funded initially from all cash funds in the Debtor's possession on the Effective Date, less funds required to be paid under the Plan on the Effective Date and less funds required to establish the Operating Reserve Requirement. On or before the last Business Day of each full calendar month following the Effective Date, the Debtor shall deposit into the Plan Fund the Excess Net Cash Flow (Class Flow less expenses and mortgage payments and less amount to maintain or replenish the Operating Reserve to the Operating Reserve Requirement as Established in the Plan) received during the prior calendar month. All funds in the Plan Fund will be disbursed semi-annually, on a pro rata basis, to the holders of Class 6 Claims until such claims are paid in full with interest. Although it is difficult to predict when the Class 6 Claims will be paid in full, because sales revenues will be used to fund the Plan Fund, the Debtor expects that the Class 3 Claims could be paid in full in as little as 2-3 years.

### C. MEANS FOR IMPLEMENTING PLAN

Feasibility of the Plan is based upon a significant reduction in the value of the Debtor's real estate assets and then in dependant solely upon rental income, rather than sales of assets. The operating expenses of the Debtor are not expect to increase above those the Debtor is current incurring as set forth in its monthly operating reports on file with the Bankruptcy Court. In addition to rentals, the Debtor will also continue to offer properties on a "Rent to Own" basis ("RTO"). Generally, these transactions involve leases from 18-24 months with a fixed purchase price at the conclusion of the lease. Although the Debtor would prefer that sales of the RTO properties be financed through outside sources, the Plan has been devised to allow the Debtor to "carry" sales of RTO properties by utilizing "wrap around" financing. Under the provisions for treatment of the Class 4 Claimants under the Plan in the first Chapter 11 Case, the Debtor has included a clause eliminating the "due on sale" clause contained in most real estate financing

documents. By eliminating these clauses, the Debtor can sell the RTO properties, leaving the existing liens in place and receiving a second or wrap around mortgage for the difference between the existing mortgage balance and the sales price. This in turn, increases the Debtor cash flow and enables the Debtor to accelerate payment to the Class 6 unsecured creditors. Moreover, the wraparound financing allows for sales to be consummated even if the current financial markets remain unavailable to the sub-prime borrower. This gives the Debtor an edge over other properties for sale where the Seller may not be in a position to offer to provide financing for the sale.

**VII.    CASH REQUIREMENTS AND ADMINISTRATIVE CLAIMS.**

Counsel for the Debtor estimates that legal, accounting and other professional fees and costs, in excess of any retainers, to bring this matter to confirmation will aggregate approximately $40,000, and will make proper application to the Bankruptcy Court for approval of those fees. If approved, the Debtor anticipates that these fees and costs would be paid from funds in the Debtor's Unencumbered Account. Provision for payment of pre- and post-petition fees and for filing of post-confirmation reports with the United States Trustee are set forth in Sections 1.1 and Article 15 of the Plan.

**VIII.   LIQUIDATION ANALYSIS.**

Under the Plan, all allowed claims are to be paid in full. Were the Debtor to cease operations, the Debtor's secured lenders, which hold a lien on virtually all of the Debtor's assets, would in all likelihood, foreclose on their collateral. Were this to occur, given current market conditions, it is unlikely the Debtor could sell the Properties to realize any equity before the foreclosures would occur. In such an event, the Debtor estimates that the value of any remaining assets would not be sufficient to pay the claims of unsecured creditors. The real estate and financing markets in Tucson, Arizona, are presently in such a state of uncertainty that any attempt to further analyze the outcome of a liquidation and it benefits to creditor would be mere conjecture. As a

result, the Debtor believe all creditors will receive more pursuant to the Plan than if this case were converted to a case under Chapter 7.

## IX. CONTEMPLATED LITIGATION.

The Debtor contemplates that litigation may be necessary to remove certain improper liens from its assets. In addition, the Debtor contemplates the continuation of other smaller collection foreclosure, evictions and real estate related actions against third parties. The Debtor reserves the right to commence any such litigation that related to claims that arose before the Effective Date of the Plan, for a period of one (1) year following the Effective Date of the Plan. Finally, the Debtor reserves the right to object to any claim for a period up to and including sixty (60) days following the Effective Date of the Plan, and to thereafter pursue any litigation that may arise there from.

The Debtor does not contemplate any litigation to recover pre-petition transfers or payments as preferential or fraudulent (also known as avoidance claims). In the 90 day prior to the filing of the Debtor Chapter 11 Petition, the Debtor made no payments to creditors other than in the ordinary course of business, and deferred most, if not all payments to both secured and unsecured creditors. According to the Debtor records, no transfers of assets to affiliates or insiders occurred within the year prior to the Petition Date, unless such transfers were for fair consideration (I.E. documents loans that were repaid prior to the Petition Date,).

## X. TAX CONSEQUENCES OF THE PLAN.

Implementation of the Plan may have significant tax consequences to the shareholders and all other classes of creditors. SAID PERSONS AND ENTITIES SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF IMPLEMENTATION OF THE PLAN.

Although creditors and parties in interest should rely solely upon their tax advisors for advice regarding the tax consequences and implications of the Plan, the Debtor believes that the

following comments and opinions may be useful in considering any such consequences and implications. The following comments and opinions have not been reviewed or passed upon by an accountant, attorney or other tax professional. The Debtor is unable to warrant or represent that any of the information, comments or opinions contained herein are without any inaccuracy.

If consummated, the Plan may result in debt discharge for certain creditors, which in turn, might result in the recognition of income. Should the implementation of the Plan result in the discharge of indebtedness or be treated as such, the debt so discharged may be recognized as income to the Debtor under § 108 of the Internal Revenue Code. This basic rule is subject to numerous exceptions and modifications in § 108 and other sections of the Internal Revenue Code.

## XI. **REFERENCE TO PLAN.**

All creditors and other parties in interest should review carefully the "Debtor's Plan of Reorganization" filed contemporaneously with this Disclosure Statement, for the specific treatment of any claim or class of claims. In the event of any discrepancy with this Disclosure Statement, the terms of the Plan shall control. All information contained in this Disclosure Statement, unless otherwise noted herein, has been obtained from the records of the Debtor and assembled by its staff. NO STATEMENT OR REPRESENTATION MADE WITH RESPECT TO THE DEBTOR, THE ESTATE AND ITS ASSETS, THE PLAN OR THIS DISCLOSURE STATEMENT IS AUTHORIZED EXCEPT AS CONTAINED HEREIN OR CONSISTENT WITH THE EXPRESS TERMS OF THE PLAN. ALL CREDITORS AND PARTIES IN INTEREST ARE URGED TO REVIEW THE PLAN WITH THEIR OWN COUNSEL.

ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN WHAT IS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU. YOU SHOULD REPORT ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS TO COUNSEL FOR THE DEBTOR, GIBSON, NAKAMURA & GREEN, P.L.L.C., 2329 N. TUCSON BLVD, TUCSON, ARIZONA 85716,

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

(520) 722-2600. COUNSEL, IN TURN, WILL INFORM THE COURT, WHICH MAY TAKE SUCH ACTION, AS IT DEEMS APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN REVIEWED OR PASSED UPON BY AN ACCOUNTANT. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE IN EVERY RESPECT, ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THE BEST OF THE DEBTOR'S INFORMATION, KNOWLEDGE AND BELIEF.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN REVIEWED OR VERIFIED BY GIBSON, NAKAMURA & GREEN, P.L.L.C., BANKRUPTCY COUNSEL FOR THE DEBTOR. GIBSON, NAKAMURA & GREEN, P.L.L.C. HAS RELIED UPON INFORMATION SUPPLIED BY THE DEBTOR, AND ON SUCH OTHER MATTERS AS HAVE COME TO THE ATTENTION OF THE ATTORNEYS PREPARING THIS DISCLOSURE STATEMENT AS ARE DISCLOSED HEREIN. GIBSON, NAKAMURA & GREEN, P.L.L.C. DOES BELIEVE THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE TO THE BEST OF ITS KNOWLEDGE AND INFORMATION.

THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN, AND THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE COURT ENDORSES OR APPROVES THE PLAN, BUT ONLY THAT THIS INFORMATION IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS AND INTEREST-HOLDERS TO MAKE INFORMED DECISIONS WHETHER TO APPROVE OR TO REJECT THE PLAN.

**XII.** **MANNER OF VOTING ON PLAN.**

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the ballot for accepting or rejecting the Plan (the "Ballot")

accompanying this Disclosure Statement and filing and/or sending the Ballot as directed in the Order Approving this Disclosure Statement transmitted herewith.

## XIII. CONFIRMATION OF PLAN.

### A. SOLICITATION OF ACCEPTANCES.

This Disclosure Statement has been approved by the Bankruptcy Court in accordance with Bankruptcy Code § 1125. This Disclosure Statement is intended to assist creditors in evaluating the Plan and determining whether to accept or reject the Plan. Under the Bankruptcy Code, votes with regard to the Plan cannot be solicited unless a copy of this Disclosure Statement, previously approved by the Bankruptcy Court, is furnished prior to or concurrently with such solicitation.

### B. HEARING ON CONFIRMATION OF PLAN.

The Bankruptcy Court has set August 30, 2010, at 10:00 o'clock a.m., as the time for hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied. Each creditor and equity security holder will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's Notice of Hearing on Confirmation of Plan.

### C. ACCEPTANCES NECESSARY TO CONFIRM PLAN.

At the confirmation hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by each class of creditors or equity security holders whose claims or interests are impaired under the Plan. Pursuant to Bankruptcy Code § 1126, an impaired class is deemed to have accepted the Plan if (i) at least two-thirds in amount and (ii) more than one-half in number of the allowed claims or interests who have voted on the Plan have voted to accept it.

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

### D. CONFIRMATION POSSIBLE WHERE CLASS DOES NOT ACCEPT.

Even if an impaired class of claims or interests does not accept the Plan, the Court may nevertheless confirm the Plan. To do so, the Court must find that the Plan: (1) is fair and equitable with respect to each class of claims or interest that is impaired and has not accepted the Plan; and (2) that each holder of a claim or interest receives or retains under the Plan, an account of such claim or interest, property of a value, as of the effective date of the Plan, that is not less than the amount that would be received or retained if the estate was liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes that these requirements, among others, are satisfied under the Plan, in that all classes of creditors, other than the shareholders of the Debtor, shall receive payment in full of their claims.

### XIV. CONCLUSION AND RECOMMENDATION.

The Debtor believes that their Plan provides the greatest likelihood for the payment of both secured and unsecured creditors and therefore believes that acceptance of the Plan is in the best interest of each and every class of creditors. Accordingly, the Debtor recommends acceptance of the proposed Plan of Reorganization.

DATED this 9th day of June, 2010.

GIBSON, NAKAMURA & GREEN, P.L.L.C.


By: /s/ Scott D. Gibson (007395)
    Scott D. Gibson
    Kristen M. Green
    Attorneys for Debtor

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

GIBSON, NAKAMURA & GREEN, P.L.L.C.
LAW OFFICES
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

CERTIFICATE OF SERVICE

Original electronically filed and copies of the foregoing served via the Court's CM/ECF Notification System this 9th day of June, 2010, on all Electronic Case Filing Participants that have appeared in the above-captioned case, or U.S. Mail to parties not registered through CM/ECF.

Elizabeth C. Amorosi
United States Trustee
230 N. First Ave., Suite 204
Phoenix, AZ 85003

Howard A. Chorost
21 E. Speedway Boulevard
Tucson, AZ 85705
Attorney for Vantage West Credit Union

Clifford B. Altfeld
ALTFELD, BATTAILE & GOLDMAN, P.C.
250 N. Meyer Ave.
Tucson, AZ 87501
Attorneys for Canyon Community Bank

Troy E. Larkin
PIMA COUNTY ATTORNEY
Civil Division
32 N. Stone Ave., Suite 2100
Tucson, AZ 85701

Clyde Gavin
7240 S. Camino Mirlo
Tucson, AZ 85747
Creditor

Hilary B. Bonial
F# 7745-N-3145
9441 LBJ Freeway, Suite 350
Dallas, TX 75243
Attorney for Specialized Loan Servicing, LLC, American Home Mortgage Servicing, Inc., Saxon Mortgage Services

Specialized Loan Servicing, LLC
8742 Lucent Blvd., Suite 300
Highlands Ranch, CO 80129
Creditor

Nancy J. March
DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 E. Broadway Blvd., #200
Tucson, AZ 85716
Attorneys for RMKM Family Ltd Partnership

American Home Mortgage Services, Inc.
1525 S. Beltline Road, Suite 100 N
Coppell, TX 75019
Creditor

Dennis J. Clancy
RAVEN, CLANCY, & McDONAGH, P.C.
313 South Convent
Tucson, AZ 85701
Attorneys for CNH Capital America LLC

Maria Tsagaris
MCCALLA RAYMER, LLC
1544 Old Alabama Road
Roswell, GA 30076-2102
Attorneys for Litton Loan Servicing, L.P., and Saxon Mortgage Services, and America's Servicing Company

Dennis A. Rosen
LAW OFFICES OF DENNIS A. ROSEN
1670 E. River Road, Suite 124
Tucson, AZ 85718
Attorneys for Creditors John Munic Enterprises, Creditors Rosen, and Creditor Kennedy

Gerard O'Meara
GUST ROSENFELD, PLC
1 S. Church Ave., Suite 1900
Tucson, AZ 85701-1620
Attorneys for Alaska Seaboard Partners, L.P.

LAW OFFICES
GIBSON, NAKAMURA & GREEN, P.L.L.C.
2329 N. TUCSON BLVD.
TUCSON, ARIZONA 85716
(520) 722-2600

| | |
|---|---|
| Mark S. Bosco<br>TIFFANY & BOSCO<br>2525 East Camelback Road, Suite 300<br>Phoenix, AZ 85016<br>Attorneys for Citibank, N.A., U.S. Bank National Association; Residential Funding Company, LLC; Chase Home Finance LLC; Deutsche Bank National Trust Company; Kondaur Capital Corporation; Flagstar Bank, FSB | Carolyn Lee-Lemons<br>7993 W. Tree Frog Trail<br>Tucson, AZ 85735<br>Creditor<br><br>The Ridge 4 Homeowners Association<br>c/o Carolyn B. Goldschmidt<br>Monroe McDonough Goldschmidt & Molla, PLLC<br>4578 North First Avenue, Ste. 160<br>Tucson, AZ 85718-5607<br>Attorneys Secured The Ridge 4 Homeowners Association |
| Saxon Mortgage Services<br>1270 Northland Drive, Suite 200<br>Mendota Heights, MN 55120<br>Creditor | |
| Michael M. Neal<br>LAW OFFICE OF MICHAEL M. NEAL<br>110 S. Church, Suite 4298<br>Tucson, AZ 85701<br>Attorneys for Bank of Arizona | Josephine E. Piranio<br>PITE DUNCAN<br>4375 Jutland Drive, Suite 200<br>P.O. Box 17933<br>San Diego, CA 92177-0933<br>Attorneys for Ocwen Loan Servicing, LLC |

By: /s/ Maria Calderon